UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 4:18-CR-374-2 |
| | ) | |
| | ) | (BRANN, D.J.) |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| LAMONT PAYNE, | ) | |
| Defendant | ) | |

MEMORANDUM FOR COVID-19 BAIL DECISION
*Defendant Payne's Motion for Bail, Doc. 80*

## I.     INTRODUCTION

Before the Court is Mr. Payne's Motion for Presentence Release (Doc. 80).

Along with the Motion, a Brief (Doc. 81), the required notice (Doc. 85), and the

Government's Brief in Opposition (Doc. 86) were filed. For the reasons detailed in

this Memorandum, the request for release from detention will be denied.

## II.     BACKGROUND & PROCEDURAL HISTORY

This case began with the indictment of two individuals, including Lamont

Payne on November 8, 2018. (Doc. 1). Mr. Payne had his Arraignment and Initial

Appearance on November 26, 2018. (Doc. 6). I ordered Mr. Payne remain detained

pending trial, as Mr. Payne was already in custody serving a sentence for different

federal criminal charges. (Doc. 16).

On November 26, 2018, Judge Brann issued a Scheduling Order (Doc. 21) which scheduled, among other things, jury selection and trial for January 7, 2019. Judge Brann later rescheduled jury selection and trial for June 1, 2020.[1]

On December 16, 2019, the Government filed notice that it had reached a Plea Agreement (Doc. 57) with Mr. Payne. A change of plea hearing was held on January 29, 2020. (Doc. 67).  Mr. Payne pled guilty and was ordered returned to Louisiana to continue serving his federal sentence on an earlier case.  At this time, Mr. Payne has not been sentenced.

On April 24, 2020, Mr. Payne filed a Motion for Bail (Doc. 80) and Brief in Support (Doc. 81). That same day, I issued an Order instructing the parties to confer by telephone to determine if a joint resolution could be reached. On May 6, 2020, Mr. Payne filed Notice (Doc. 85) that a joint resolution could not be reached regarding his continued detention.[2] On May 9, 2020, the Government filed its Brief in Opposition. (Doc. 86).

---

[1] Judge Brann granted four Motions to Continue (Docs. 27, 30, 43, 47). After a conference with the parties on July 24, 2019, Judge Brann concluded that trial should be continued to January 21, 2020. (Doc. 51). After Mr. Payne's Plea Agreement, Judge Brann granted a fifth Motion to Continue (Doc. 61), rescheduling trial for June 1, 2020.

[2] Mr. Payne did not request a hearing regarding this Motion. (Doc. 85, ¶ 3).

III.   COURT PROCEDURE FOR COVID-19 CASES

Anticipating a significant number of requests for reconsideration of bail in light of the COVID-19 pandemic, the Court instituted an expedited procedure to hear these cases in an orderly and deliberate fashion. The filing of a bail motion citing COVID-19 as a reason for release from detention will be specifically designated and a docket entry will notify counsel about the expedited procedures. That entry was made in this case on April 27, 2020.

IV.   STANDARD OF REVIEW

Mr. Payne pled guilty to one count of the indictment on January 29, 2020. Thus, Mr. Payne is no loner a pretrial detainee, as he is awaiting sentencing. Mr. Payne's continued detention is to be analyzed under 18 U.S.C. § 1343, which provides:

(a) Release or Detention Pending Sentence.—

   (1) Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, other than a person for whom the applicable guideline promulgated pursuant to 28 U.S.C. 994 does not recommend a term of imprisonment, be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer shall

order the release of the person in accordance with section 3142(b) or (c).

(2) The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (c) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained unless—

    (A)

        (i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or

        (ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and

    (B) The judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

An individual detained under Section 3143 may challenge their detention under 18 U.S.C. § 3145(c), which provides in relevant part:

A person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

18 U.S.C. § 3145(c).

## V.     REVIEW OF PREVIOUS BAIL DECISION

The Original Order of Detention was filed on November 26, 2018. (Doc. 16).

Mr. Payne did not challenge detention at that time but reserved the right to challenge

his detention at a future time. When I ordered Mr. Payne detained, he was still serving his federal sentence for a conviction in the District Court for the District of Columbia.[3] Since that time a series of re-calculations have resulted in Mr. Payne being released from federal custody on case 1:97-CR-193-TFH-1. His release from FCI Pollock in Louisiana occurred after the Covid-19 pandemic shut down most of the country. At this time, Mr. Payne is only being held on the Original Order of Detention is this case. Because of the Pandemic transportation back to Pennsylvania was not possible. He is being held at a Parish Detention Facility in Louisiana and has filed a consent to be sentenced by video conference (Doc. 74). That consent has been approved by the Court (Doc. 75). Objections to the Pre-Sentence Report are being litigated (Doc. 78, 79) and when resolved sentencing will be scheduled.

VI.    DISCUSSION OF THE COVID-19 PANDEMIC

We are mindful of the unprecedented magnitude of the COVID-19 pandemic and the extremely serious health risks it presents.[4] We are also cognizant that the President of the United States has declared a national emergency and that the

---

[3] Mr. Payne's federal conviction in the District Court for the District of Columbia is available at 1:97-CR-193-TFH-1.

[4] World Health Organization, "WHO characterized COVID-19 as a pandemic" March 25, 2020, available at https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen

Governor of the Commonwealth of Pennsylvania[5] has also declared a state of emergency to address the needs of the nation and the Commonwealth respectively. We also recognize that public health officials have strenuously encouraged the public to practice "social distancing," to hand-wash and/or sanitize frequently, and to avoid close contact with others—all of which presents challenges in detention facilities. *See United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857 *2 (D. Md. Mar. 17, 2020). As of May 6, 2020, 121 cases have been issued around the country citing *Martin*. Of the cases that cite *United States v. Martin,* most of the decisions were to detain the defendant. In *United States v. Davis*, the judge denied the government motion for pretrial detention because the detention facility already had cases of COVID-19 and the individual was not a flight risk and posed no serious threat to the community. *United States v. Davis*, No. ELH-20-09, 2020 WL 1529158

---

[5] Governor Thomas Wolf proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa.C.S. §7301(c) on March 6, 2020. He ordered all non-essential business in the Commonwealth to close on March 20, 2020, and he extended the closure of non-essential businesses and schools "indefinitely" to slow the progression of the pandemic. "Gov. Wolf and Sec. of Health Expand 'Stay at Home' Order to Carbon, Cumberland, Dauphin and Schuylkill Counties, Extend School Closures Indefinitely," March 30, 2020, available at https://www.governor.pa.gov/newsroom/gov-wolf-and-sec-of-health-expand-stay-at-home-order-to-carbon-cumberland-dauphin-and-schuylkill-counties-extend-school-closures-indefinitely/. That Stay at Home Order was extended to all 67 counties on April 2, 2020 to be effective thru April 30, 2020. https://www.pa.gov/guides/responding-to-covid-19/#StayatHomeOrder (last accessed April 4, 2020).

(D.Md. Mar. 30, 2020). The case also relied heavily on expert opinion that pretrial facilities are poorly equipped to manage the highly contagious and potentially deadly coronavirus. *Id.* A majority of the cases that granted temporary release were people detained due to immigration proceedings. *See e.g.*, *Basank v. Decker*, No. 20-cv-2518 AT, 2020 WL 1481503, (S.D.N.Y. Mar. 26, 2020) and *Coronel, et al. v. Decker, et al.*, No. 20-cv-2472 AJN, 2020 WL 1487274 (S.D. N.Y. Mar. 27, 2020). Additionally, there was one case that only granted review of bail hearings to be assessed on a case to case basis. See *Karr v. State*, No. 4FA-19-00872CR, 2020 WL 1456469 (Alaska Ct. App. Mar. 24, 2020).

In a precedential opinion analyzing a COVID-19 release request in the context of the compassionate release provisions of the First Step Act, the Third Circuit concluded that COVID-19 risk alone does not require release where the prison system has a plan in place to deal with the pandemic.

> We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread. *See generally* Federal Bureau of Prisons, *COVID-19 Action Plan* (Mar. 13, 2020, 3:09 PM), https://www.bop.gov/resources/news/20200313_covid-19.jsp. Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance. And given the

Attorney General's directive that BOP "prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic," we anticipate that the exhaustion requirement will be speedily dispatched in cases like this one. Memorandum from Attorney Gen. to Dir., Bureau of Prisons 1 (Mar. 26, 2020), https://www.justice.gov/file/1262731/download. So we will deny Raia's motion.

*U.S. v. Raia,* 20-1033, slip op. at 8 (3d Cir. April 2, 2020)

On March 31, 2020, Judge Jones of this Court ordered the immediate release of fourteen men and women held in ICE civil detention in Pike, Clinton and York County facilities. According to Judge Jones, "Each of the petitioners suffers from chronic medical conditions and faces an imminent risk of death or serious injury if exposed to Covid-19." *Thakker v. Doll*, 1:20-cv-0480, slip op. at 2 (M.D. Pa. March 31, 2020). Ruling on their habeas "conditions of confinement" petitions[6] he found that "…a remedy for unsafe conditions need not await a tragic event." *Thakker v. Doll*, 1:20-cv-0480, slip op. at 6 (M.D. Pa. March 31, 2020). His review of the safety procedures at these three immigration facilities found they were insufficient to overcome the speculative risk of infection and death for an "imminent irreparable harm" finding in the TRO context.

---

[6] Petitioners invoked the jurisdiction of the Court under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (original jurisdiction), 28 U.S.C. § 2241 (habeas jurisdiction), and Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause) (Doc. 1, p. 6).

The Petitioners' claim is rooted in imminent, irreparable harm. Petitioners face the inexorable progression of a global pandemic creeping across our nation—a pandemic to which they are particularly vulnerable due to age and underlying medical conditions. At this point, it is not a matter of *if* COVID-19 will enter Pennsylvania prisons, but *when* it is finally detected therein. It is not unlikely that COVID-19 is already present in some county prisons—we have before us declarations that portions of the Facilities have been put under ineffective quarantines due to the presence of symptoms similar to COVID-19 among the inmate population. Indeed, we also have reports that a correctional officer at Pike has already tested positive for COVID-19. (footnotes omitted).

. . . .

Based upon the nature of the virus, the allegations of current conditions in the prisons, and Petitioners' specific medical concerns, detailed below, we therefore find that Petitioners face a very real risk of serious, lasting illness or death. There can be no injury more irreparable.

*Thakker v. Doll*, 1:20-cv-0480, slip op. at 8,9 (M.D. Pa. March 31, 2020).

Judge Jones cites several immigration detention cases where release has been ordered. *Thakker v. Doll*, 1:20-cv-0480, slip op. at 18-20 (M.D. Pa. March 31, 2020. He balanced the public interest in continued detention this way: "Finally, the public interest favors Petitioners' release. As mentioned, Petitioners are being detained for civil violations of this country's immigration laws." *Thakker v. Doll*, 1:20-cv-0480, slip op. at 23 (M.D. Pa. March 31, 2020).

In concluding that immediate release was required in these fourteen cases Judge Jones said:

In times such as these, we must acknowledge that the *status quo* of a mere few weeks ago no longer applies. Our world has been altered with lightning speed, and the results are both unprecedented and ghastly. We now face a global pandemic in which the actions of each individual can have a drastic impact on an entire community. The choices we now make must reflect this new reality.

Respondents' Facilities are plainly not equipped to protect Petitioners from a potentially fatal exposure to COVID-19. While this deficiency is neither intentional nor malicious, should we fail to afford relief to Petitioners we will be a party to an unconscionable and possibly barbaric result. Our Constitution and laws apply equally to the most vulnerable among us, particularly when matters of public health are at issue. This is true even for those who have lost a measure of their freedom. If we are to remain the civilized society we hold ourselves out to be, it would be heartless and inhumane not to recognize Petitioners' plight.

*Thakker v. Doll*, 1:20-cv-0480, slip op. at 24 (M.D. Pa. March 31, 2020).

The language of this case is strong and persuasive in the civil detention context.[7]  However, to apply this reasoning to prisons and jails across the board in all criminal cases is a much different matter. Different interests must be balanced when a criminal defendant has been detained only after a finding that no condition or combination of conditions will assure the presence of the defendant and the safety

---

[7] The Government appealed Judge Jones's decision to the Third Circuit and requested an administrative temporary stay. The Third Circuit granted the temporary stay request within hours. On April 21, 2020, the Third Circuit issued an Opinion concluding that it has jurisdiction to hear the Government's appeal of Judge Jones's decision. The Third Circuit will address the merits of the Government's appeal after the parties have had the opportunity to brief the issues. *See Hope v. Warden York County Prison*, No. 20-1784, 2020 WL 1922372 (3d Cir. Apr. 21, 2020).

of the community. The balancing is likewise different when a criminal defendant is serving a sentence. The question of civil detention, early parole or compassionate release is not before me. This is a decision about bail during a pandemic.

I believe I must make an individualized determination as to whether COVID-19 concerns are compelling in a particular case to justify temporary release.

## VII.   FLIGHT RISK AND DANGER TO THE COMMUNITY

I first note that Mr. Payne remains a flight risk and a danger to the community. Mr. Payne has not proven by clear and convincing evidence that he is unlikely to flee or pose a danger to the safety of the community if released.

Regarding flight risk and dangerousness, Mr. Payne argues:

Mr. Payne is not a flight risk or a danger to the community and otherwise meets the criteria for release under §§ 3142 and 3143.

Mr. Payne is 43 years old. He has spent the last 22 years in federal prison. He has spent more of his life in federal prison that (sic) he has on the streets of Washington D.C. Mr. Payne has only a junior high school education and is legally disabled. He is learning-impaired with a full-scale IQ of 61, and until his incarceration, was receiving Social Security Income due to that disability. (PSR ¶¶ 51, 53)[.]

Mr. Payne was born and raised in the District of Columbia and has significant and lifetime ties to the D.C. area, including his mother Celeste Payne, his father Charles Clock, paternal grandmother, Elizabeth Clock and one surviving sibling, Antonio Payne. All of his family remains supportive of him. His mother, Celeste has worked for the federal government (Government Publishing Office) for 37 years.

She has agreed to be Mr. Payne's third-party custodian. If released, Mr. Payne would reside with his grandmother Elizabeth Clock.

Furthermore, upon Mr. Payne's release to the street, he is already ordered to report to the D.C. probation officer for five years of supervised release as part of his prior sentence. If that is not enough, his mother, a federal employee for 37 years, will act as Mr. Payne's third-party custodian.

The Court should further consider the fact that pursuant to Mr. Payne's plea agreement, his current guideline sentence, before any objections to the PSR and any variances, is 12 to 18 months. The plea agreement includes contemplation of a six month sentence below the bottom of the 12 month guidelines, or 6 months. Thus, home detention and/or electronic monitoring are within the realm of sentencing alternatives.

Finally, the treatment of a very real human being is at stake here. That individual, Lamont Payne, who possesses an IQ of 61, is legally disabled, has been incarcerated for the past 22 years. Mr. Payne is beloved by his family, yet because of their financial limitations and Mr. Payne's locations of confinement, he has not seen family, including his dearly loved mother, for over a decade.

(Doc. 81, pp. 8-10).

Regarding dangerousness, the Government argues:

Payne is a man who has been incarcerated since 1997 due to a violent home invasion and robbery. PSR ¶ 26. When he was arrested, he was in possession of a firearm. *Id.* Payne's arrest record shows two additional convictions where the defendant possessed a firearm, including an incident where he cocked and pointed a gun at a woman after she refused to give him a cigarette. PSR ¶¶ 22-23. Moreover, Payne committed a felony drug offense that gave rise to a federal indictment while he was on release for the simple assault involving the gun.

Payne's actions and criminal convictions prior to his incarceration, though they stretch far into the past, certainly fail to provide clear and

convincing evidence that Payne is neither a flight risk for (sic) a danger to others. To the contrary, they raise grave concerns regarding both factors.

Unfortunately, Payne's behavior while incarcerated for over two decades provides little confidence in the defendant's current ability to abide by the rules of pre-trial services or behave lawfully should he be abruptly released. In his time in the Bureau of Prisons, Payne has amassed a disciplinary history of over thirty incidents. *See* Government Exhibit A, PSR ¶ 27. Many of the incidents, including the incident that gave rise to this incident, show a willingness to possess weapons or otherwise engage in violent behavior.

(Doc. 86, pp. 5-6).

As to flight risk, the Government argues:

Payne's asserted belief that detention increases his chances of infection suggests that his incentives to avoid punishment and additional incarceration in light of the COVID-19 virus have increased. Furthermore, monitoring a defendant's location – or tracking him down were he to abscond – adds another set of burdens to the work of law enforcement and probation officers who are already laboring under increasingly difficult conditions in light of the pandemic.

*Id.* at p. 6.

Further, the Government specifically challenges the factual assertions raised

by Mr. Payne:

In the five paragraphs that follow the defendant's assertion that he is neither a flight risk nor a danger to the community, very few, if any, facts are raised that justify the claim. The family members presented as suitable anchors for the defendant are, presumably, the same family members who were available to provide Payne with stability two decades ago when he was possessing handguns, selling drugs, and committing violent home invasions. The only community proffered

Page 13 of 20

where Payne developed significant ties is the same community that he terrorized over the course of his teenage and young adult years.

Nothing in the defendant's brief provides clear and convincing evidence that he is neither a flight risk nor a danger to the community. Having failed to carry his burden, the defendant's detention must be continued pending sentencing under 18 U.S.C. [§] 3143(a)(1).

*Id.* at p. 8.

I find the Government's arguments regarding flight risk and danger to the community to be persuasive. Mr. Payne has not met his burden that he would not be a flight risk or a danger to the community. Thus, I find by clear and convincing evidence that Mr. Payne remains a flight risk and danger to the community.

## VIII.  WHETHER EXCEPTIONAL REASONS EXIST WARRANTING PRESENTENCE RELEASE OF MR. PAYNE

I note at the outset that Mr. Payne has not alleged that there is a substantial likelihood that a motion for acquittal or new trial will be granted. Thus, Mr. Payne seeks release due to "exceptional reasons" under 18 U.S.C. § 3145(c). As noted above, I have already found that Mr. Payne remains a flight risk and danger to the community.

Mr. Payne fails to clearly show that there is an exceptional reason why his continued detention is inappropriate. Mr. Payne discusses the general dangers of COVID-19, the increased risks of COVID-19 transmissions in prisons, and how he is a high risk for infection based on his medical history.

## A. SPECIAL HEALTH CONCERNS

Mr. Payne alleges that he is particularly vulnerable to COVID-19 based on his

medical conditions, specifically asthma. Mr. Payne argues:

> In consideration of the unparalleled throes of this public health crisis,
> the Court should consider Mr. Payne's release. As the PSR notes, he
> does suffer from asthma and other ailments. PSR ¶ 47. As a result, Mr.
> Payne's respiratory condition, combined with the surroundings of his
> confinement, movement in and out of custody, create the ideal
> environment for contracting COVID-19. His asthma status alone places
> him at higher risk of death if he contracted the virus.

(Doc. 81, pp. 7-8).

We remain sympathetic to Mr. Payne's concerns regarding COVID-19 and

the possibility of health complications, but "[s]uch speculation does not constitute a

'compelling reason' for temporary release." *United States v. Loveings*, Cr. No. 20-

0051, 2020 WL 1501859, at *3 (W.D. Pa. Mar. 20, 2020). District courts in the Third

Circuit have reached that same conclusion regarding temporary release, even in

cases where the defendant indicated respiratory conditions. *United States v.

Pritchett*, CR 19-280, 2020 WL 1640280, at *3 (W.D. Pa. Apr. 2, 2020) (despite

being sympathetic to defendant's medical conditions, including asthma, speculation

concerning possible future conditions in jail does not constitute a "compelling

reason" for temporary release.); *United States v. Jones*, 2:19-CR-00249-DWA, 2020

WL 1511221, at *3 (W.D. Pa. Mar. 29, 2020) (holding that while the defendant

suffered from hypertension, sleep apnea, and asthma – respiratory issues making the defendant at a higher risk for COVID-19 – his present health conditions were not sufficient to establish a compelling reason for release in light of the danger to the community posed by his release and the efforts undertaken at the jail to combat the spread of the virus).

## B. Specific Conditions in the Place of Detention

"The Court is mindful that it bears a fiduciary responsibility to those that are detained in jails and prisons. The incarcerated look to the Courts for protection of their health, welfare and personal rights in general. However, the Courts are not on the front line. That space is rightly occupied by corrections officials and their administration."[8] The Chief Judge of this Court issued Standing Order 20-5 on March 25, 2020, requiring all detention facilities where persons are being held by order of this court to notify the Chief Judge and the judicial officer who signed the detention order if a federal detainee is in medical isolation or quarantine for any reason.[9] As of the filing of this Opinion, no notice has been received from St. Martin

---

[8] *United States v. Williams*, No. PWG-13-544, 2020 WL 1434130 (slip copy) (D. Md. Mar. 24, 2020).
[9] "…Further, each detention center shall promptly notify the Marshal for this District of any federal detainee who is in medical isolation or quarantine at their facility for any reason, promptly upon the entry of such detainee into such status. The Marshal shall then so notify the undersigned and the judicial officer who entered the Order of commitment of such status.

Parish Correctional Center that Mr. Payne is in medical isolation or quarantine for any reason.   It is not clear if the Order regarding Federal Detainees has been transmitted to the St. Martin Parish Correctional Center.

However, according to the Louisiana Department of Corrections, safety measures have been taken in the state prisons in response to the COVID-19 pandemic. These measures include:

- Activated DOC existing regulations regarding influenza and Pandemic Prevention/Preparedness/Response to the highest level.
- Pursuant to the governing Department Regulation, every state prison has a thorough and detailed COVID-19 Pandemic response plan in place.
- Suspended Visitation, volunteering, tours, programming, transfers between prisons/routine transfers from local level, and postponed the Angola spring rodeo all in effort to minimize movement.
- Limited Dining areas to servicing one dorm at a time.
- Limited Recreation space (outside and gymnasium) to one housing area using it at a time on rotational basis.
- Limited new intakes to only those who must be housed in state prison. Each intake is screened and assessed for symptoms, and then quarantined for 14 days before being placed in general population.
- Daily screening all DOC employees prior to entrance. Anyone entering Louisiana's state-run prisons and DOC facilities,

---

The Clerk's Office is DIRECTED to transmit a copy of this Order to the U.S. Marshal, who shall advise each involved detention center of its content, and who shall provide a copy of same to each detention center and each relevant law enforcement agency."

Standing Order 20-5, https://www.pamd.uscourts.gov/news/standing-order-2020-005 (last accessed April 4, 2020).

including employees and vendors, is subject to enhanced
screening prior to entering. This includes answering screening
questions and having their temperature taken.

- Ramped up daily disinfectant cleaning protocols at every prison
facility.
- Each facility has quarantine and isolation capabilities which are
being used as needed.[10]

These precautions seem to be consistent with the CDC Guidelines for
Detention Facilities.[11]  Mr. Payne argues generally regarding prison conditions and
COVID-19. There is nothing before this Court to indicate that any specific problem
has developed at St. Martin Parish Correctional Center and neither party has
provided any information to the Court on this issue.

## C.  NUMBER OF CONFIRMED CASES

Based on the evidence before me at this time, there is no evidence of any
confirmed cases of COVID-19 in St. Martin Parish Correctional Center. In all of St.
Martin Parish, where St. Martin Parish Correctional Center is located, there are two
hundred and sixty (260) confirmed cases and twenty-one (21) deaths as of 9:00 a.m.
today (May 12, 2020). While these numbers are not guaranteed into the future, they
do not suggest an immediate and unavoidable risk. Mr. Payne seeks release to his

---

[10] This information is available in an April 9, 2020 memorandum from the
Louisiana Department of Public Safety and Corrections. (available at
https://doc.louisiana.gov/covid-19-information/).

[11]http://www.cdc.gov/coronavirus/2019-ncov/community/correction-
detention/ guidance-correctional-detention.html.

family in Washington D.C. In Washington D.C., there have been six thousand three

hundred and eighty-nine (6,389) confirmed cases and three hundred and twenty-

eight (328) deaths.

### D. RELEASE PLAN

Regarding his potential release, Mr. Payne states:

Mr. Payne was born and raised in the District of Columbia and has significant and lifetime ties to the D.C. area, including his mother Celeste Payne, his father Charles Clock, paternal grandmother, Elizabeth Clock and one surviving sibling, Antonio Payne. All of his family remains supportive of him. His mother, Celeste has worked for the federal government (Government Publishing Office) for 37 years. She has agreed to be Mr. Payne's third-party custodian. If released, Mr. Payne would reside with his grandmother Elizabeth Clock.

Furthermore, upon Mr. Payne's release to the street, he is already ordered to report to the D.C. probation officer for five years of supervised release as part of his prior sentence. If that is not enough, his mother, a federal employee for 37 years, will act as Mr. Payne's third-party custodian.

(Doc. 81, pp. 8-9).

It appears that Celeste Payne (his mother) would be an appropriate third-party

custodian for Mr. Payne, but I do not find that presentence release of Mr. Payne is

appropriate at this time.

## IX.    CONCLUSION

For all of the reasons set forth above, Mr. Payne has failed to demonstrate that he should be released presentencing. Therefore, his Motion for Release (Doc. 80) will be denied. An appropriate order follows.

Date: May 12, 2020                    BY THE COURT

                                      *s/William Arbuckle*
                                      William Arbuckle
                                      U.S. Magistrate Judge